[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 57 
 I.
This is a lien priority case. The holder of a second deed of trust securing future advances made such an advance after a junior creditor had enrolled his judgment and perfected his lien. The Chancery Court enforced the future advance clause and assigned its lien a priority relating back to the recording of the original deed of trust, priming the judgment lien.
We affirm on this issue, although we remand for further proceedings on another.
 II.
In the early 1980s, Hobart W. Gentry, Jr., and Georgia C. Gentry owned Lot 53 of Rosewood Heights Subdivision to the City of Hattiesburg, Mississippi, commonly known by street number as the residence at 1105 North 34th Avenue. At all times relevant hereto, this property has been subject to the lien of a deed of trust, the beneficiary of which was Deposit Guaranty Mortgage Company and its predecessors in interest. The Deposit Guaranty lien was a conventional, residential first mortgage.
The first of today's combatants is Credithrift of America, Inc. On April 8, 1981, the Gentrys negotiated a second mortgage, home equity loan with Credithrift, borrowing the sum of $23,679.36. The Gentrys executed and delivered a second deed of trust conveying a security interest in the 34th Avenue property to Ben Hendrix, trustee for the benefit of Credithrift, and this deed of trust was duly recorded in the land records of Forrest County, Mississippi. Of considerable consequence, this deed of trust contains a future advance clause, in legal colloquia sometimes a "dragnet clause," which reads as follows:
 In addition to the indebtedness specifically mentioned above and any and all extensions or renewals of the same or any part thereof, this conveyance shall also cover such future and additional advances as may be made to the Grantor, or either of them, by the beneficiary. . . .
The clause went on to provide that the conveyance in trust secured
 any and all debts, obligations, or liabilities, direct or contingent, of the grantor herein, or either of them, to the beneficiary, whether now existing or hereafter arising at any time before actual cancellation of this instrument on the public records of mortgages and deeds of trust, whether the same be evidenced by note, open account, overdraft, endorsement, guaranty or otherwise.
Nothing in any of the papers obligated Credithrift to make any future advances.
Over the next two years or so, the Gentrys made intermittent payments to Credithrift, reducing their indebtedness, and on July 12, 1983, refinanced the balance, giving a new note in the principal amount of $14,150.26, and a new (arguably superfluous) deed of trust. The original April 8, 1981, deed of trust, however, was not cancelled of record and, indeed, it is apparent *Page 58 
Credithrift regarded the refinancing of July, 1983, as a "renewal of the . . . [original indebtedness]" pursuant to the dragnet clause of the April 8, 1981, deed of trust.
Enter Thomas E. Shutze, our other combatant. Shutze resides in Lamar County, Mississippi, and apparently had business dealings with the Gentrys, the nature of which is not disclosed in the record, nor is it important, except that on September 20, 1984, the County Court of Forrest County entered a judgment in favor of Shutze and against Hobart W. Gentry, Jr., in the original principal sum of $4,541.78. This judgment was duly enrolled in Forrest County on October 23, 1984, and its lien thereupon acquired the powers our law provides.
Re-enter Credithrift — eleven months later. By this time, the Gentrys had reduced their indebtedness to Credithrift to $11,215.13. On August 23, 1985, the Gentrys again refinanced — "renewed" — their loan with Credithrift and executed a new note in the principal sum of $14,150.26, repayable in installments at interest. The future advance — "the new money" — the Gentrys received was $2,784.13. Credithrift again regarded the renewal and advance as within the dragnet clause of the 1981 deed of trust which it in no way cancelled or released, although it did take the precaution of a new deed of trust.
Over the next several years, the Gentrys struggled financially. It appears they made their payments to Credithrift through the Spring of 1988. At some point thereafter, they abandoned all and left for the West Coast and are believed in Reseda, California. Their creditors immediately resorted to the 34th Avenue residence to satisfy their respective debts.
No one questions that Deposit Guaranty Mortgage Company held a good, valid and perfected first lien and security interest by virtue of its 1978 deed of trust. Second mortgage holder Credithrift and judgment lien creditor Shutze, however, litigated below regarding their respective rights, and particularly the priority thereof with regard to Credithrift's future advance of $2,784.13 made after Shutze perfected his judgment lien. It appears in the Summer of 1988, Credithrift appointed a substituted trustee under the original April 1, 1981, deed of trust and that on July 12, 1988, the trustee foreclosed on the Gentrys' property and sold it to Credithrift, the sole bidder, for the sum of $10,739.65, the amount of the Gentrys' indebtedness to Credithrift as of that day. The foreclosure, of course, was subject to Deposit Guaranty Mortgage's prior rights. Credithrift has since made its peace with the first mortgage holder, paying off its indebtedness and acquiring its rights.
The Chancery Court of Forrest County resolved the remaining controversy in favor of Credithrift. The Court first held that Credithrift's 1981 deed of trust contained a valid and enforceable dragnet clause securing all refinancing, renewals, and future advances and that this included the sums Credithrift advanced to the Gentrys on August 23, 1985. The Court acknowledged that Shutze had obtained a judgment against Hobart W. Gentry, Jr., on September 23, 1984, and that he had enrolled that judgment on October 23, 1984. The Court found, however, that at the time of the August, 1985, refinancing and advance to the Gentrys, Credithrift "had no actual notice of the plaintiff's [Shutze] judgment." On this basis, the Chancery Court held that Shutze's judgment lien was wholly junior and subordinate to the lien of Credithrift's 1981 deed of trust and, further, that Credithrift's foreclosure on July 12, 1988, extinguished Shutze's judgment lien vis-a-vis the 34th Avenue property. The Court in effect confirmed Credithrift's foreclosure and adjudged that Shutze take nothing.
Shutze now appeals to this Court.
 III.
Future advance clauses are enforceable according to their tenor. Accepting their creative and constructive role in a credit economy and, as well, freedom of contract, we have upheld such clauses for more than a century. See Coleman v. Galbreath,Stewart, Co., 53 Miss. 303, 306 (1876). The point has been repeatedly litigated since, and we have repeatedly *Page 59 
ruled, incident to a secured transaction, the debtor and secured party may contract that the lien or security interest created thereby shall secure other and future debts which the debtor may come to owe the secured party. Such clauses are treated like any other provisions in a contract and will be enforced at law subject only to conventional contract defenses, e.g., fraud, duress, and the like, none of which are present here.
We noted the practical rationale for such clauses in NewtonCounty Bank v. Jones, 299 So.2d 215 (Miss. 1974).
 When inserted in a deed of trust, such a clause operates as a convenience and an accommodation to . . . [borrowers]. It makes available additional funds without . . . [their] having to execute additional security documents, thereby saving time, travel, loan closing costs, costs of extra legal services, recording fees, et cetera.
Newton County Bank, 299 So.2d at 218. And so Whiteway FinanceCo., Inc. v. Green, 434 So.2d 1351 (Miss. 1983) but repeats the obvious when it says matter-of-factly, as between the parties, "`dragnet clauses' are valid and enforceable in Mississippi."[1] Whiteway Finance, 434 So.2d at 1353. Seealso, Kelso v. McGowan, 604 So.2d 726, 729 (Miss. 1992);Merchants National Bank v. Stewart, 608 So.2d 1120, 1125 (Miss. 1992); Cochran v. Deposit Guaranty National Bank,509 So.2d 1045, 1047 (Miss. 1987); Trapp for Use and Benefit, etc. v.Tidwell, 418 So.2d 786, 792 (Miss. 1982); Newton County Bank v.Jones, 299 So.2d 215, 217 (Miss. 1974); Holland v. Bank ofLucedale, 204 So.2d 875 (Miss. 1967); Walters v. M M Bank ofEllisville, 218 Miss. 777, 784-85, 67 So.2d 714, 717-18 (1953);In Re Oswalt, 41 B.R. 868 (N.D.Miss. 1983); see generally, G. Nelson D. Whitman, Real Estate Finance Law § 12.8 (2d Ed. 1985); Restatement of the Law (Third), Property-Security(Mortgages) § 2.1 (Tent.Dr. No. 1, March 22, 1991).
There can be no question but that, vis-a-vis the Gentrys, the lien or security interest[2] Credithrift held in the 34th Avenue residence secured all sums the Gentrys owed Credithrift through and including the 1985 refinancing, renewal and new advance.
 IV. A.
Shutze accepts all of this but argues, instead, it proves little regarding the conflicting priorities issue he tenders. More specifically, Shutze concedes the 1981 deed of trust established Credithrift's priority the moment it was recorded, regarding of like priority the 1983 renewal and refinancing and any other indebtedness within the dragnet's reach, up until October of 1984. Shutze's point is that on October 23, 1984, he enrolled his judgment to the tune of some $4,541.78 plus interest and that, from and after that date, he held by law a lien on all of Gentry's property in the county. Miss. Code Ann. § 11-7-197
(1972). He argues further that his judgment lien is entitled to priority as of the date of enrollment, and in this he is correct. Miss. Code Ann. §§ 11-7-191 and 89-5-1, et seq. (1972). Credithrift does not dispute this. Indeed, our question is not which lien came first. All admit that the lien of Credithrift's April 8, 1981, deed of trust has priority over Shutze's October 23, 1984, judgment lien. Miss. Code Ann. § 89-5-5 (1972). Our question is the reach of Credithrift's lien and whether it extends to Credithrift's *Page 60 
1985 refinancing and future advances.
The former point is easy. Insofar as the 1985 secured transaction between Credithrift and the Gentrys represented a renewal of sums outstanding under their prior secured loans, Credithrift is entitled to priority. It would be anomalous indeed to hold that a secured creditor loses his priority position when he refinances a debt such as this. See Whiteway Finance, 434 So.2d at 1353; Holland v. Bank of Lucedale, 204 So.2d at 877. It is true Miss. Code Ann. § 89-5-21 (1972) requires one such as Credithrift to cancel its deed of trust upon its receipt of "full payment of the money due by the mortgage or deed of trust." Miss. Code Ann. § 89-1-49 (1972) is to like effect. The 1985 renewal no doubt "paid" the earlier note in a formalistic sense, but it was hardly "full payment" within the language of the deed of trust nor the statutory imperatives.[3] See Whiteway Finance, 434 So.2d at 1353. All agree Credithrift would prevail if, in 1983 and 1985, it had merely taken a new note incident to the renewal, refinancing or advance. Out of an abundance of precaution, Credithrift — while leaving the 1981 deed of trust uncancelled and unsatisfied — took new deeds of trust in 1983 and 1985. No sensible reason is offered why we should seize on this added security precaution and thereby render Credithrift less secure. Nor does Miss. Code Ann. § 89-5-19 (1972) embarrass what we say, as from the face of the record Shutze's April 8, 1981, note and the lien securing same, renewal or no, are alive and well.[4] *Page 61 
The more difficult question concerns the 1985 future advance of $2,784.13.[5] Witczinski v. Everman, 51 Miss. 841, 846 (1876), though decided a good while back, speaks perceptively to the point.
 A mortgage to secure future advances, which on its face gives information as to the extent and purpose of the contract, so that a purchaser or junior creditor may, by an inspection of the record, and by ordinary diligence and common prudence, ascertain the extent of the encumbrance, will prevail over the supervening claim of such purchaser or creditor as to all advances made by the mortgagee within the terms of such mortgage, whether made before or after the claim of such purchaser or creditor arose. [Emphasis supplied]
The Witczinski future advance clause was far less elaborate than Credithrift's but was nevertheless held
 enough to show a contract that . . . is to stand as security . . . for such indebtedness as may arise from future dealings between the parties,
by reason of which the Court held it
 sufficient to put a purchaser or encumbrancer on inquiry, . . . .
Witczinski, 51 Miss. at 846.
This duty of inquiry beyond the face of the public record had been accepted earlier in Summers Brannin v. A. Roos Co.,42 Miss. 749, 780 (1869),[6] a case legally even more analogous to today's. Baggett, a common creditor like unto the pre-judgment Shutze, contracted with debtors after the deed of trust had been recorded and thereafter sued out an attachment, only to have the priority of his debts primed by future advances under the deed of trust.[7] *Page 62 
Gray v. Helm, 60 Miss. 131, 141 (1882), reiterated theWitczinski rule, and a generation later Candler v. Cromwell,101 Miss. 161, 57 So. 554 (1911), reinforced it in the context of an "open account" future advance clause far more ambiguous than that here and of facts legally analogous. The holder of a crop mortgage containing the "clause" had advanced some $87.00 after the competing creditor's judgment lien attached to the crops. The Court held for the mortgage holder, quoting at length fromWitczinski.[8] Candler, 101 Miss. at 171-72, 57 So. at 556.See also, Baker v. Building Loan Association of Jackson,168 Miss. 808, 816, 152 So. 288, 290 (1934).
North v. J.W. McClintock, Inc., 208 Miss. 289, 44 So.2d 412
(1950), is a troublesome case. In September of 1947, McClintock made a real estate secured loan to Harper, the deed of trust containing a dragnet clause. Harper paid part of the debt, then in April of 1948, gave a new deed of trust to North to secure a new loan. North immediately recorded her deed of trust. Three weeks later Harper signed a new $650.00 note to McClintock. Upon Harper's default, McClintock and North got into a priority fight regarding McClintock's last advance. In a fact-sensitive opinion, this Court held the priority issue to turn on whether, at the time of his last advance to Harper, McClintock "had actual knowledge of the existence of the North deed of trust."[9]North, 208 Miss. at 301, 44 So.2d at 414. In an effort to sidestep Witczinski and progeny, North implies it matters whether the future advance was "obligatory" or "voluntary."[10]North, 208 Miss. at 299-300, 44 So.2d at 414. We find nothing in Witczinski or any of the following cases that makes anything turn on this distinction.
Nothing in North purports to overrule Witczinski and progeny. It does not so much as mention Candler. The Court makes a curious (and legally irrelevant) reference to its inability to find the Witczinski record. North, 208 Miss. at 300, 44 So.2d at 414. In a perceptive dissent, Justice Alexander takes the North Court to task for ignoring the rule settled inWitczinski and followed consistently for three quarters of a century.[11]
Whiteway Finance returns to first principles. Again, the question concerns the priority rights of a secured creditor making a future advance under a clause such as *Page 63 
that here at issue vis-a-vis a third party who has, prior to the advance, acquired perfected rights in the property. InWhiteway the creditor had made a loan to Percy Lee Green in 1974. The loan was secured by certain real property via a deed of trust which contained a dragnet clause providing that it would secure future advances. Less than two years later, Green conveyed the property by warranty deed to his father, Washington Green, Jr., and this warranty deed was lodged of record and in law became notice to the world. Miss. Code Ann. §§ 89-5-1 and -5 (1972). Five months later, Percy Lee Green refinanced the outstanding balance of the original 1974 loan and borrowed from Whiteway new money in the amount of $3,500.00.
To be sure, the conveyance from Percy Lee Green to his father smacks of fraud, though the opinion neither makes nor proceeds on any assumption thereof. What we regard as important is the Court's treatment of the future advance — the money Whiteway loaned Green after he had conveyed the property to his father and had placed the deed of conveyance of public record. As between Percy Lee Green and Whiteway, the Court, of course, held the future advance clause enforceable and that the original deed of trust secured the $3,500.00 in new money. The Court then in so many words says this $3,500.00 lien had priority over the rights of Washington Green, Jr., notwithstanding the latter's perfected rights via the recorded warranty deed.[12] Whiteway Finance,
434 So.2d at 1353.
The principle undergirding Whiteway is that, for priority purposes, the lien securing the future advance takes its date from the recording of the original deed of trust and by operation of law reaches forward to secure the advance made after intervening rights became perfected. The reason we permit this is the same we found in Witczinski and Summers Brannin almost 120 years ago and in Candler a generation later. Third parties dealing with the debtor — Washington Green, Jr., in Whiteway,
Thomas E. Shutze in today's case — are given notice by the public record that the recorded lien secures any future advances. Those third parties are charged at their peril to inquire of the debtor and prior secured creditors. Candler, 101 Miss. at 172, 57 So. at 556; Witczinski, 51 Miss. at 846; Summers Brannin, 42 Miss. at 780. The device of a subordination agreement or notice to terminate[13] may be available but, failing some legally effective contract or notice rearranging rank, third parties cannot be heard to complain when the original secured creditor's future advances are accorded the priority its publicly recorded instrument imports.
Nothing said here turns on the fact that in 1985, at the time of its last advance to the Gentrys, Credithrift had no actual knowledge of Shutze's judgment nor the lien thereof. We quite agree with the point Shutze stresses on appeal, that the Circuit Court erred when it held Credithrift prevailed by reason of its lack of actual knowledge.[14] Shutze's enrolled judgment became notice to the world from and after October 23, 1984, and the fact that Credithrift did not know of it in no way affects Shutze's rights. Where Shutze fails is in his inability to see the Credithrift's lien was perfected three and a half years prior to his judgment lien and, by reason of the dragnet clause, Credithrift's lien reaches forward and secures the 1985 renewal and advance. Credithrift's dragnet clause had been a matter of public record since 1981, and under Witczinski and progeny would-be *Page 64 
creditors such as Shutze were charged with knowledge thereof and with a duty of diligent inquiry regarding further details,before doing business with Gentry whether on open account or otherwise.[15]
All of this makes perfectly good sense in today's world. Our citizens and their secured creditors need the flexibility dragnet clauses provide. The demands of our agricultural credit economy are as great as in the days of Witczinski and Summers Brannin. Draws on construction loans and disbursements under lines of credit are other common examples of future advances businessmen need and secured lenders make. Second mortgage home equity loans are a more recent area of need. Many Mississippians need to borrow substantial sums with which to educate their offspring and to borrow by the semester as tuition payments become due. They and their lenders need the security of the knowledge that their priority position will remain fixed to the date of the original deed of trust or security agreement, so that they can save "time, travel, loan closing costs, costs of extra legal services, recording fees, et cetera," as in Newton CountyBank v. Jones, 299 So.2d at 218. There is no reason our law should demand new title searches incident to each advance. Any other view could imperil the student's education in mid-stream. The same may be said for opportunities our citizens pursue and in many other areas of social and economic life. The public records system each county maintains affords third parties full opportunity for knowledge which, if pursued with diligence, protects such third parties from being blind-sided.[16] And because they will know we mean what we say, creditors do not have to record a new deed of trust every time a future advance is made which, if nothing else, avoids cluttering up the land records.
 B.
There is another dimension. The Uniform Commercial Code as originally enacted in Mississippi treated the priority of liens securing future advances the same as our cases noted above. Miss. Laws, ch. 316, §§ 9-301, etc. (1966).[17] Effective July 1, 1986, we amended our law to limit the lien's priority (though not its enforceability) to future advances made within forty-five days of perfection of an intervening lien or without actual knowledge of the new lien. Miss. Code Ann. § 75-9-301(4) (Supp. 1991).[18] This enactment does not directly reach real estate secured transactions. Miss. Code Ann. § 75-9-102(1) and -104(j) (1972). It does, however, pronounce the public policy in an area on its face indistinguishable in principle from real estate secured transactions. Dragnet clauses legally identical to Credithrift's abound in personal property security agreements across this state. We perceive no good reason why this legal language should have one meaning and effect where the security is personalty and an altogether different *Page 65 
meaning and effect where the security is realty. Cf. Wansley v.First National Bank of Vicksburg, 566 So.2d 1218, 1224-25 (Miss. 1990) (by analogy, applying Mississippi UCC Section 75-9-504(3) to real estate mortgage foreclosure); Hughes v. Tyler,485 So.2d 1026, 1029, 1033-34 (Miss. 1986) (holding Mississippi UCC Section 75-3-606 applicable to assumption of a mortgage loan). We sharpen the point when we see dragnet clauses in mixed security agreements, where the collateral is a combination of real and personal property and a single dragnet clause says all collateral stands to secure all future advances.[19]
If we imported Section 75-9-301(4) into our law of real estate secured transactions, we would cut back the reach of the dragnet clause. We need not take that step today, for Credithrift prevails even under the UCC. The Chancery Court found as a fact that, at the time of its 1985 refinancing and advance, Credithrift "had no actual notice of . . . [Shutze's] judgment," suggesting perhaps the language in North v. J.W. McClintock,Inc., 208 Miss. at 209-301, 44 So.2d at 414, is after all not so far from the mark. The point for the moment is, given the findings of fact, Credithrift prevails even under amended Section75-9-301(4), if we enforced it by analogy.[20]
 V.
Alternatively, Shutze argues, even if his judgment lien is wholly junior and subordinate to Credithrift's rights, the value of the collateral was nevertheless such that he should be paid in full.
The record reflects that in April of 1981, the Gentrys' 34th Avenue residence was appraised at $76,500.00. Apparently, prior to foreclosure, Credithrift engaged Homeland Titles Company to do a "quick sales appraisal" — an appraisal that contemplated having to sell the house within ninety days. The quick sales appraisal of the Gentrys' property was $60,000.00. Credithrift bought the property at foreclosure for $10,739.65. Because it bought subject to Deposit Guaranty's first mortgage indebtedness — $37,145.00 at the time — Credithrift in effect paid $47,884.00 for the property. Given these figures, one can readily see that, even if we accept the quick sales appraisal, there has been an equity left in the home from (the proceeds of) which Shutze's judgment might be satisfied.
Of course, none of this is sufficient to void the foreclosure, and a valid and effective foreclosure extinguishes all subordinate rights. The foreclosing trustee
 has the exact same power to convey free and clear of junior liens or interests as though he held a deed absolute filed for record the day the deed of trust was recorded.
People's Bank and Trust Co. v. L T. Developers, Inc.,434 So.2d 699, 708 (Miss. 1983). Our long-standing rule is that a foreclosure sale will not be set aside unless the sales price is so inadequate as to shock the conscience or to amount to a fraud.Wansley v. First National Bank of Vicksburg, 566 So.2d 1218, 1224 (Miss. 1990); Central Financial Services, Inc. v. Spears,425 So.2d 403, 405 (Miss. 1983). We are not here so shocked.
We have emphasized that *Page 66 
 this rule concerns only the legality of the foreclosure sale for purposes of vesting title to the collateral in the creditor or other purchaser at foreclosure. It has nothing whatsoever to do with the separate and distinct question of what, if any, deficiency judgment may be allowed.
Wansley, 566 So.2d at 1224. Nor, as here, does it have to do with the separate and distinct rights of junior creditors who follow the proceeds of the sale and assert equitable claims. For purposes of deficiency judgment against the debtors, our cases have long recognized that the terms of foreclosure or other dispositions must be commercially reasonable and that, particularly where the foreclosing creditor buys at foreclosure, it must give the debtor fair credit for the commercially reasonable value of the collateral. Wansley, 566 So.2d at 1221-22, 1224-25. The same principle protects the rights of a junior lien creditor such as Thomas E. Shutze. Builders SupplyCompany of Hattiesburg v. Pine Belt Savings Loan Assoc.,369 So.2d 743 (Miss. 1979).
Shutze initiated this proceeding in the Chancery Court and asked inter alia that the Court adjudge "all of the rights and interests of the parties. . . ." Shutze asked further "for such other relief to which he may be entitled." In the present context, we find this sufficient to place before the Court the matter of Shutze's rights in the "equity" in the 34th Avenue property. Unfortunately, in the Court below these rights were not finally adjudged. The Chancery Court made no finding of fact of the value of the property at the time of foreclosure or at any other time. We have before us hearsay opinion evidence that in 1981 the property had a fair market value of $76,500.00. We have further hearsay evidence that at the time of foreclosure, the property had a quick sale value of $60,000.00. Nothing before us shows whether Credithrift has disposed of the property for a profit or a loss, nor whether such disposition may have been commercially reasonable, nor, for that matter, do we know whether Credithrift has disposed of the property at all.
All of this leaves us with the firm and definite conviction that there is unfinished business below. We remand this case to the Chancery Court for further proceedings consistent with this opinion.
AFFIRMED IN PART; REMANDED IN PART FOR FURTHER PROCEEDINGS.
ROY NOBLE LEE, C.J., and PRATHER, SULLIVAN and BANKS, JJ., concur.
HAWKINS, P.J., dissents with written opinion, joined by DAN M. LEE, P.J., in results only.
DAN M. LEE, P.J., dissents with separate opinion joined by HAWKINS, P.J., and PITTMAN and McRAE, JJ.
[1] The term "dragnet clause" connotes breadth of reach and is thought something much more than a conventional future advance clause. Future advances are one sort of debt included within dragnet clauses. All such clauses are enforced by reference to their language and law and not their label.
[2] In today's technical legal parlance, Credithrift's interest in the 34th Avenue property is a "security interest," not a "lien." See Restatement of the Law (Third), Property-Security(Mortgages) (Tent. Dr. No. 1, March 22, 1991), and § 4.1(a) (Tent. Dr. No. 2, March 25, 1992); see also, Miss. Code Ann. §75-1-201(37) (Supp. 1991); and South Mississippi Finance Companyv. Mississippi State Tax Commission, 605 So.2d 736, 738 fn. 1 (Miss. 1992).
[3] In dissent Presiding Justice Dan Lee argues "payment." He cites no authority, as there is none. Nor does Shutze mention the point. To be sure, the 1981 note was "paid" by the 1983 note, which in turn was "paid" by the 1985 note. None of this discharged the 1981 deed of trust. Each of these new notes represented a "renewal" and/or "future or additional advance" within and secured by the 1981 deed of trust. Any other view would be unfortunate. Oftentimes debtors and secured creditors have bona fide need of refinancing, not to mention future advances. Under the view advanced in the dissent, any secured party entered into such a refinancing would thereby forfeit the effective date and priority of its security interest. It would require needless and expensive title searches. This, of course, would sharply curtail a debtor's ability to refinance.
We reject the dissent theory in its entirety, but, if we were inclined to credit it so far as its logic may suggest, we would still affirm. Indulging a heavy dose of formalism, we see that Gentry's July 12, 1983, debt was incurred before his April 8, 1981, note was "paid." On July 12, 1983, in a technical sense, Credithrift loaned Gentry $14,150.26 which he only then used to pay the outstanding balance on the April 8, 1981, note. Thus, Gentry's 1983 debt was a "future or additional" debt within and secured by the 1981 deed of trust because it was formally and legally incurred before the 1981 note was paid. (The converse assumption would stand logic on its head.) The same holds for the 1985 future advance. The 1981 deed of trust having thus been kept alive and saved from extinguishment under Section 89-1-49 and/or Section 89-5-21, it was alive and well on August 23, 1985, the date of Gentry's last refinancing. On that date, Credithrift made Gentry a loan of $11,215.13 (plus the future advance) and to evidence the same took Gentry's enforceable note before Gentry paid the outstanding balance on the July 12, 1983, note. The moment the August 23, 1985, loan was made, it became still another "future or additional" debt within and secured by the 1981 deed of trust, by reason of which by no stretch could Gentry's subsequent payment of the 1983 note activate the statutes and require Credithrift to cancel its 1981 deed of trust.
[4] In dissent, Justice Hawkins invokes Miss. Code Ann. §89-5-19 (1972), which provides the lien of a deed of trust ceases when, on the face of the record, it appears time barred. The reference is inappropriate, because on the face of the record the obligation secured by Credithrift's 1981 deed of trust was alive and well at all relevant times — through and including today!
The deed of trust at bar provides for an aggregate installment debt of $23,679.36, incurred April 8, 1981, including add on interest at eighteen percent (18%) per annum, "Terms: 72 payments of $328.88 each" (from which one needs no special powers to know this probably means 72 monthly payments). The key (which Justice Hawkins omits from his dissenting opinion) is the interest rate: eighteen percent (18%) per annum. For one thing, from common usage we know installment notes like this are almost always payable monthly (as distinguished from weekly, semi-annually, etc.). Beyond this, we look at $23,679.76 payable in 72 installments of $328.88 each, including interest at 18%, and know intuitively this probably means for a six-year term, the 72 payment proviso being most suggestive.
Candor requires concession that precise mathematical calculation shows the intuitive mind in error — by one cent($.01) or .0011%, depending on your point of view. Starting with the three "givens" — (1) 72 payments of (2) $328.88 each for (3) a total indebtedness of $23,679.36 — a six year payout works only if the interest rate is 17.9989%. On the other hand, if we hold the interest rate of 18%, the last of the 72 payments must jump to $328.89, yielding Credithrift a windfall profit of one cent! [These calculations are made using the Truth In Lending Regulation Z Annual Percentage Rate Tables, 12 C.F.R. § 226, Appendices D and J.] Of course, we know in addition to all of this, the note was made April 8, 1981. From what appears from the face of the record, we may easily calculate with precision that the last installment is due on or about March 8, 1987. The statute of limitations then enforceable on written contracts including promissory notes was six years from the date the last payment was due, as Justice Hawkins points out. The six-year statute would expire March 8, 1993. Add the six-month grace period, and we readily see nothing in Section 89-5-19 that need concern us until September 8, 1993, which may explain why neither Shutze nor the Chancery Court nor anyone else has so much as mentioned the statute until today. That the maturity date is not expressed but must be inferred is of no consequence where, as here, from the facts given, the inference is so conclusive. We have sanctioned far looser inferences. See Leach v. Tingle,586 So.2d 799, 803-04 (Miss. 1991).
[5] The record reflects that at the time of foreclosure, the Gentrys owed Credithrift $10,739.65. Neither party discusses the question of whether this sum reflects unpaid portions of the Gentrys' refinanced indebtednesses or the new advances made in August of 1985. Nothing turns on the point, and we make no effort to decipher it.
[6] A testament to the healing power of time, we seem to have forgotten a citation to "42 Miss." was once unthinkable. See,e.g., Simmons v. Bank of Mississippi, 593 So.2d 40, 42 (Miss. 1992); Bondafoam, Inc. v. Cook Construction Co., Inc.,529 So.2d 655, 658 (Miss. 1988); State Security Life Insurance Co.v. State, 498 So.2d 825, 830 (Miss. 1986); Natural Father v.United Methodist Children's Home, 418 So.2d 807, 809 (Miss. 1982); but see, Matter of Estate of Childress, 588 So.2d 192, 195 n. 4 (Miss. 1991). We think the Summers Brannin case persuasive, notwithstanding it was decided by a court many once thought alien. See Lusby v. Kansas City, Memphis BirminghamRailroad Co., 73 Miss. 360, 371, 372, 377, 19 So. 239, 242, 244 (1896).
[7] We are reassured that our traditional view is the modern view. The current draft of Restatement of the Law (Third),Property-Security Mortgages provides:
 § 2.3 Priority of Future Advances
 (a) If a mortgage secures future advances, all such advances have the priority of the original mortgage.
The point is explained in commentary and then illustrated with a case legally analogous to today's.
 Comment:
 Priority of future advances in general. This section recognizes that all future advances take the priority of the original mortgage. There is no distinction between advances that the mortgagee is contractually obligated to make and those that are option.
 Illustration:
 1. Mortgagor borrows $50,000 from Mortgagee, and executes a note and mortgage which state that future advances up to an additional $25,000 may be made by Mortgagee in the future. However, Mortgagee has no obligation to make such advances. The mortgage also states that it secures interest at 10% per annum and Mortgagee's attorneys' fees in any collection action. Thereafter J obtains a judgment against Mortgagor and properly records it so as to impose a lien on Mortgagor's real estate. Mortgagee has actual knowledge of this lien. Then Mortgagee lends and Mortgagor accepts an additional $25,000 advance. Mortgagor defaults on the loan, owing the full balance and $10,000 in interest. Mortgagee may recover in foreclosure the $75,000 balance, the $10,000 of interest, and Mortgagee's attorneys' fees to the extent permitted by local law. All of these items have priority over J's lien.
Restatement of the Law (Third), Property-Security (Mortgages) § 2.3, pp. 88, 90 (Tent. Dr. No. 1, March 22, 1991).
[8] This was in a day when no one would have dreamed of citing "42 Miss.," though Summers Brannin obviously supports theCandler holding.
[9] No small irony attends the Chancery Court's implicit reliance on North to hold for Credithrift, viz, the Court's finding of fact that Credithrift "had no actual notice of . . . [Shutze's] judgment" when in 1985 it refinanced Gentry and made him a new advance.
[10] The proposed new Restatement finds the obligatory/optional distinction "impossible to apply . . . coherently in practice" and rejects it. Restatement of the Law (Third),Property-Security (Mortgages) § 2.1, Comment a, p. 48, and § 2.3, Reporters' Notes, pp. 94-95 (Tent. Dr. No. 1, March 22, 1991). A generation ago, Prof. Gilmore dissected this "conceptually nonsensical distinction" and explained
 there are few, if any, future advance clauses which an astute judge cannot, at will, classify on one side or the other of the line between obligatory and voluntary.
2 Gilmore, Security Interests in Personal Property § 35.4, p. 930 (1965).
[11] Other states have other rules. Outside the North
majority, however, everyone else reads Witczinski and progeny as we read them. See, e.g., Osborne, Mortgages § 120 (1951); Jones, Mortgages §§ 447, 452, 454, 455, 457 (8th Ed.) (1928); 2 Gilmore, Security Interests in Personal Property § 35.4 fn. 7 and accompanying text (1965); Blackburn, Mortgages to SecureFuture Advances, 21 Mo.L.Rev. 209, 228 (1956); Annotation, 138 A.L.R. 566, 576-77 (1942).
[12] The Whiteway opinion recites that, prior to the 1976 advance, Percy Lee Green "had not revealed . . . to the loan company" the fact of his conveyance to his father. 434 So.2d at 1352. This fact in no way informs or controls the Court's subsequent legal analysis.
[13] See Restatement of the Law (Third), Property-Security(Mortgages) § 2.3(b) (Tent. Dr. No. 1, March 22, 1991).
[14] The Court below used the phrase "actual notice." From the context, including the proof at trial, the Court obviously meant "actual knowledge" as distinguished from "constructive notice" or "constructive knowledge." Compare Miss. Code Ann. § 75-1-201(25) thru (27) (Supp. 1991).
[15] Nothing said here should be read to question our settled rule that, if the future advances are made under a construction loan and the intervening lien is a mechanic's lien, the construction advances are subordinated to the mechanic's lien to the extent that the lender did not use reasonable diligence to ensure that the funds were used in payment for labor and materials on the site. Peoples Bank Trust Co. v. L TDevelopers, Inc., 434 So.2d 699 (Miss. 1983); Deposit GuarantyNat'l Bank v. E.Q. Smith Plumbing Heating, Inc., 392 So.2d 208
(Miss. 1980).
[16] Restatement of the Law (Third), Property-Security(Mortgages) § 2.1, Comment c, p. 49 (Tent. Dr. No. 1, March 22, 1991).
[17] Prof. Gilmore's is the most prominent pursuit of this priority problem under UCC Article 9 as originally adopted in this state. 2 Gilmore, Security Interests In Personal Property,
§ 35.6 (1965); but see, Note, Priority of Future AdvancesLending Under the Uniform Commercial Code, 35 U.Chi.L.Rev. 128, 132-37 (1967).
[18] Miss. Code Ann. § 75-9-301(4) (Supp. 1991), in its entirety, reads:
 A person who becomes a lien creditor while a security interest is perfected takes subject to the security interest only to the extent that it secures advances made before he becomes a lien creditor or within forty-five (45) days thereafter or made without knowledge of the lien or pursuant to a commitment entered into without knowledge of the lien.
See Miss. Laws, ch. 343, § 1 (1986).
Section 75-9-301(4) is taken verbatim from the 1972 Amendments to the Official Text of the Uniform Commercial Code. 3 U.L.A.,Uniform Commercial Code 334-35 (1981).
[19] See, e.g., Mississippi Bankers Association UCC Form No. 4 (September, 1967) published in Bank Manual on Articles Fourand Nine, Mississippi Uniform Commercial Code 136-37 (1967).
[20] For what it may be worth, the National Conference of Commissioners on Uniform State Laws in 1975 promulgated the Uniform Land Transactions Act. UTLA § 3-301(b)(2) provides:
 (b) A recorded security interest takes priority as of the date of its recording as to advances or obligations thereafter made or incurred under the security agreement:
 (2) If not made pursuant to a commitment made before the secured party had knowledge of an intervening interest, to the extent of advances or obligations outstanding when the secured party obtained knowledge of the intervening interest and that do not exceed the maximum amount stated in the record; . . .
13 U.L.A. 590 (1986). Ten years later the NCCUSL promulgated a Uniform Land Security Interest Act, Section 302(c)(2) of which says the same thing. 7A U.L.A. 210 (1992 Supp.). If this were our rule, Credithrift would still prevail over Shutze.