# IN THE COURT OF APPEALS
## OF THE
## STATE OF MISSISSIPPI
### NO. 95-CA-00331 COA

**MAGNOLIA FEDERAL BANK FOR SAVINGS AND**                                    **APPELLANTS**
**WILLIAM F. JONES, TRUSTEE**

**v.**

**I. MEADE HUFFORD AND DIANNE P. HUFFORD**                                   **APPELLEES**

THIS OPINION IS NOT DESIGNATED FOR PUBLICATION AND MAY NOT BE CITED,
PURSUANT TO M.R.A.P. 35-B

| | |
|---|---|
| DATE OF JUDGMENT: | 03/03/95 |
| TRIAL JUDGE: | HON. HYDE RUST JENKINS II |
| COURT FROM WHICH APPEALED: | ADAMS COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | ROBERT S. MURPHREE |
| | H. A. MOORE III |
| ATTORNEYS FOR APPELLEES: | R. BRENT BOURLAND |
| | WALTER BROWN, JR. |
| NATURE OF THE CASE: | CIVIL - OTHER |
| TRIAL COURT DISPOSITION: | DEBTOR TO RECEIVE DIFFERENCE BETWEEN FAIR MARKET VALUE AND THE DEBT/EXPENSES OF SALE; ATTORNEYS FEES AND PRE-JUDGMENT INTEREST |
| DISPOSITION: | REVERSED ON DIRECT APPEAL; AFFIRMED ON CROSS-APPEAL - 10/7/97 |
| MOTION FOR REHEARING FILED: | October 20, 1997 |
| CERTIORARI FILED: | 12/29/97 |
| MANDATE ISSUED: | 4/6/98 |

BEFORE THOMAS, P.J., KING, AND SOUTHWICK, JJ.

SOUTHWICK, J., FOR THE COURT:

This suit concerns a startling, initially suspicious-appearing, but from all the evidence, an innocent coincidence. The day after the foreclosure sale of a house to the holder of the first deed of trust, a potential buyer who had not known of the foreclosure saw the house for the first time. The next day that buyer made an offer for more than the foreclosure amount. The issue is the former

debtors/mortgagors' entitlement to share in the proceeds from that second sale. The chancellor after a two-day trial held that the former debtors were entitled to all of the sales price of the second sale, less the expenses incurred by the creditor and the full amount of the debt owed. We reverse, holding that absent an irregularity in the foreclosure procedures or price, the former debtors cannot claim a share in proceeds of a subsequent sale. The rules governing the rights of parties after a foreclosure not only control in the usual case, but also in the startling coincidences.

## STATEMENT OF FACTS

I. Meade and Diane P. Hufford owned a Natchez antebellum mansion called The Cliffs. Magnolia Federal Bank for Savings held a deed of trust on the property. Evidence at trial indicated that the Huffords had tried for over a year to sell the home, but were unsuccessful. Near the end of that year Magnolia desired to foreclose, but prior to any sale the Huffords declared bankruptcy. At a hearing conducted on whether to lift the bankruptcy stay, the Huffords indicated that the property was worth $650,000. Magnolia put on proof that the outstanding balance on the loan as of March 7, 1986, was approximately $512,000, with interest of $211 per day. A second lender, Deposit Guaranty National Bank, had a subordinate deed of trust with a balance due of $343,000. The bankruptcy court lifted the stay and abandoned the property. After other court proceedings temporarily delayed the foreclosure, it was finally conducted on Wednesday, October 1, 1986.

There was evidence that Magnolia negotiated with Deposit Guaranty, the holder of the second deed of trust, suggesting that Deposit Guaranty pay off the balance of the first note and obtain the priority secured position. After getting an appraisal, Deposit Guaranty declined to do so.

Magnolia was the only bidder at the foreclosure, though the Huffords and a representative of Deposit Guaranty were present. On the date of foreclosure, the balance due on the Huffords' note was almost $551,000. Magnolia's bid price was $490,000. Magnolia had received some appraisals on the property, revealing different values for a quick sale ($407,000) and for fair market value ($543,000). As shown by the Huffords' own year-long experience of not finding a buyer, the appraisal suggested that perhaps two years would be needed to sell.

That last forecast proved dramatically erroneous. At about 9:00 p.m. on the evening of the same day as the foreclosure, a realtor contacted a Magnolia branch manager at home to inquire about the house. The realtor stated that she assumed the property had been owned for some time by Magnolia, based on the notices given much earlier about a foreclosure sale. She had been unaware that the earlier foreclosures had been delayed by court action, and that the property had only sold that day. The realtor's clients were later identified as an executive with a corporation in England who with his wife was retiring to America, having just sold their home in England for one million dollars. The clients were looking at antebellum mansions in Natchez and other Mississippi towns. On Thursday, the day after the foreclosure, the realtor showed the clients several Natchez homes, but not The Cliffs. The realtor testified that only after a day of looking at other homes, none of which seemed to satisfy her clients, did she decide to show The Cliffs. Since Magnolia had not listed The Cliffs with any real estate agency, it may not have been the house the realtor most wanted her clients to buy. Calling from a gas station phone, the realtor got Magnolia's permission to show the house. Upon seeing the house, the clients indicated an immediate interest.

The first anyone at Magnolia knew of the future buyers' interest was on Friday morning. A written

offer was made and delivered to Magnolia. At some time during the negotiations the question of a realtor's commission was raised, even though Magnolia had not listed the house with any realtors. The sale that finally occurred on December 7, 1986, was for $650,000. Magnolia paid a commission to the realtor, insurance, pro rated taxes, and a rather large attorneys' fee.

Much later at trial, the chancellor determined that the total expenses of first the foreclosure and then the second sale, when added to the balance of the note, were approximately $591,000. Regardless of the amount, the holder of the former-second deed of trust, Deposit Guaranty, demanded the difference between the second sale price and the costs of foreclosure. Its deed of trust had been canceled by the foreclosure. Deposit Guaranty's primary suspicion may have been that Magnolia had pre-foreclosure knowledge of the ultimate buyers' interest. Magnolia has denied, and the realtor and buyers have concurred, that no one knew of the buyers' interest until after the foreclosure. After a meeting between attorneys and principals for the two financial institutions, Deposit Guaranty withdrew any demands on the money.

The Huffords brought suit thirty one months later, on June 23, 1989. Their initial complaint focused on the fact that Magnolia's trustee who conducted the sale was not the kind of independent trustee required in a then-recent Mississippi Supreme Court decision. *Wansley v. First Nat'l Bank of Vicksburg*, No. 07-58207 (Miss. Apr. 5, 1989), *rev'd on reh'g*, 566 So. 2d 1218 (Miss. 1990). That opinion, which seemed to ignore the practical realities of what occurred with every foreclosure, was reversed the next year. *Wansley v. First Nat'l Bank of Vicksburg*, 566 So. 2d 1218, 1219 (Miss. 1990). Thus the complaint regarding the trustee's status was dropped.

After a two-day trial, the chancellor ruled that Magnolia owed a fiduciary duty to Hufford that was breached by Magnolia's failure to deliver to them the difference between the $650,000 and actual expenses and debt of $590,831.02. This "gain on the sale" of $59,168.98, plus interest and attorneys' fees were to be paid the Huffords. Magnolia appealed, while the Huffords cross-appeal seeking punitive damages, additional attorneys' fees and higher interest. The appeals were deflected by the supreme court to this Court.

## DISCUSSION

The ultimate question presented to us is this: what right does the former owner/mortgagor have to share in proceeds of a subsequent sale when the foreclosure sale purchaser was the mortgagee, if the foreclosure sale itself is not subject to attack? Before confronting that question, certain other threshold questions must be addressed.

*1. Did the nonjudicial foreclosure sale occur when the property was struck off to Magnolia on Wednesday, or only on Friday when the trustee's deed was executed?*

The chancellor held that the foreclosure was not "consummated" until the deed was delivered two days after the sale itself. The chancellor cites no authority for the proposition, and the parties can find none. The concept that the foreclosure remained an on-going proceeding that began on Wednesday and was not concluded until Friday was central to the chancellor's ruling. Magnolia's acquiring knowledge of a potential buyer before the sale was final created a fiduciary obligation to give the excess proceeds to the Huffords.

We first elaborate upon the facts. The trustee's deed was actually dated on Wednesday, October 1, and was acknowledged by a notary public as having been signed and delivered on Wednesday. What occurred on Friday, October 3, was the recording of the deed in the chancery clerk's office. There was no evidence to the contrary on the date of execution. Regardless of the date of recording, instruments are binding between the parties as of the date of execution; recording just gives notice to third parties. Miss. Code Ann. § 89-5-3 (1972). Since the deed was executed and title therefore conveyed prior to Magnolia's acquiring any knowledge of the potential buyer, we need not decide if the foreclosure itself is effective as of the moment the property is "struck off" to the successful bidder. Magnolia cites authority to that effect. 7 C.J.S. *Auctions and Auctioneers*, § 7. The recording of the instrument on Friday, October 3, did not enlarge Magnolia's responsibilities over what they would have been had the instrument been recorded on Wednesday.

*2. Did the deed of trust itself require the "excess" proceeds to be given the Huffords?*

The chancellor also determined that this language in the deed of trust compelled judgment for the Huffords:

Trustee shall apply the proceeds of the sale in the following order: (a) to all costs and expenses of the sale, including but not limited to reasonable Trustee's and attorney's fees and costs of title evidence; (b) to all sums secured by this Deed of Trust; and (c) the excess, if any, to the person or persons legally entitled thereto.

We have already determined that the sale did not "continue" from Wednesday through Friday, but was completed in fact and in law on Wednesday. This language in the deed of trust refers to distribution of the proceeds at the foreclosure sale, not at a subsequent sale two days or, as initially seemed the better estimate here, two years later. Had these proceeds arisen from the foreclosure, after the (a) expenses of the sale and the (b) debt owed Magnolia had been satisfied, the next (c) entity legally entitled to the proceeds would have been Deposit Guaranty, since the lien of its second deed of trust securing $343,000 attaches to the proceeds. *Builders Supply Co. v. Pine Belt Sav. & Loan Assn,* 369 So. 2d 743, 745 (Miss. 1979). However, this language on its face has no relevance to any sale other than the foreclosure itself.

*3. Was the Complaint automatically dismissed under M.R.A.P. 15?*

Magnolia argues that our Rule 15 required that the complaint be dismissed without prejudice because the chancellor had the case under advisement for over six months. The rule states that unless a party seeks mandamus from the supreme court within forty five days after the six months have run, the complaint will stand as dismissed. M.R.A.P. 15 (a) & (c). The Huffords argue that additional materials were submitted to the chancellor during that time period, which would start the six month clock running anew.

The record does not reflect that additional filings were made with the chancellor, but an evidentiary hearing could be held to make a record on that question. Regardless of the applicability of the rule, we conclude that an evidentiary hearing to determine if the six months actually ran, and if so then the complaint would stand dismissed, would be an unnecessary expenditure of resources of time and money for the parties and the courts. Considering our conclusion regarding the ultimate legal issue in

this case, we exercise our discretion under Rule 2(c) to suspend the operation of the Rule in "the interest of expediting decision." M.R.A.P. 2(c).

One issue remains on direct and cross-appeal that must be decided, since our decision on that issue renders the rest moot.

*4. What rights does a former mortgagor have to proceeds from a post-foreclosure sale?*

The long-standing rule that the Huffords wish to change is this: a purchaser at a valid foreclosure acquires the "entire interest and estate of mortgagor and mortgagee as it existed at the date of the mortgage." GEORGE E. OSBORNE, et al., REAL ESTATE FINANCE LAW, §7.17 at 473 (1979). That means the purchaser, whether it is the original creditor or a third party, takes free of any claims by subordinate lienholders or by the original debtor. *Shutze v. Credithrift of America, Inc.,* 607 So. 2d 55, 65 (Miss. 1992). The purchaser acquires the "entire estate"; there are no equitable liens carved out that remain with anyone else such as the debtors. There is case law that will be discussed that limits the contractual (note and deed of trust) rights of the former lender to seek a deficiency. There is no law, however, that has required the purchaser at a *valid* foreclosure later to account to the original debtor.

In essence, the chancellor shifted the rules for distribution of proceeds at the foreclosure itself, and made the rules applicable to the next sale, the one made by the purchaser at the foreclosure. The reason that this was done was the fact that the second sale followed so quickly on the heels of the foreclosure. Of course, we have already addressed that there is no evidence that the trustee or Magnolia had any knowledge of the prospect of this sale at the time of the foreclosure. Magnolia's actions at the foreclosure had drawn to a close. Whether the unforeseeable date for resale of the property was the next day or the next year, that resale did not impact the foreclosure or the obligations that grew out of it.

The rights a mortgagor has to proceeds when his mortgage has been foreclosed have always been measured at the time of foreclosure, and not at the time of an entirely separate transaction. "It is elementary that the proceeds of the foreclosure sale determine the rights between grantor and beneficiary of a deed of trust absent fraud, bad faith or other defect." *Merchants Nat. Bank v. Stewart,* 608 So. 2d 1120, 1127 (Miss. 1992). No bad faith or fraud allegations survived the trial.

Starting with the most fundamental, we address the various questions that can arise regarding foreclosure sales price. First, the long-standing Mississippi rule has been that the price successfully bid at foreclosure will not cause the sale to be set aside unless it is so low as to "shock the conscience." *Haygood v. First Nat. Bank,* 517 So. 2d 553, 556 (Miss. 1987); *Lake Hillsdale Estates, Inc. v. Galloway,* 473 So. 2d 461, 465 (Miss. 1985). In *Haygood*, the court referred to a student analysis of this case law that had found the "threshold of unconscionability for foreclosure sale prices lies between thirty-six and forty percent of fair value." *Haygood,* 517 So. 2d at 556, *quoting* Jimmy Reid Sledge, Jr., Note, *Mortgages -- Mortgagor's Remedies -- Unconscionable Windfall From Resale of Security Immediately After Mortgagee's Purchase . . .,* 53 MISS. L. J. 533, 546 (1983). That threshold was repeated in *Allied Steel Corp. v. Cooper*, 607 So. 2d 113, 120-121 (Miss. 1992).

The dissent relies on the "shock the conscience" case that was the subject of the law journal note, but the dissent believes it created an entirely different rule than the majority describes. *Central Financial*

*Services, Inc. v. Spears,* 425 So. 2d 403 (Miss. 1983). Though the dissent quotes at some length part of the *Spears* opinion, absent from the dissent's discussion of the case are the two sentences that immediately precede what the dissent wishes to declare is the holding:

In this case, the chancellor found that the sale price was so inadequate it shocked his conscience. This finding is amply supported by the evidence because CFS bid only $1458.86 at the foreclosure sale and twelve days later sold the property for $4,000.

*Spears,* 425 So. 2d at 405. That is exactly the finding that must be made, as is clear from the dissent's own authority, and is reiterated in the cases cited in this opinion. "Shock the conscience" may not be the most objective-sounding legal standard, but a review of the case law described here makes it evident that is the test that must be passed, or more accurately failed, in order to engage the remedies that the dissent wishes to use. Unless the foreclosure itself is invalid, which requires a price as inadequate as was the case in *Spears,* the purchaser takes good title free of claims that can be brought by the debtor. In *Spears* the debtor shared in the surplus above the debt; in other cases the remedy has been to set the foreclosure aside altogether. With that threshold finding omitted from the dissent's quote, the remainder has no context.

Next we consider what rights the creditor has after foreclosure. If the amount credited at the foreclosure is less than the debt, any attempt by that creditor to obtain a deficiency judgment will be tested "under the principles of equity." *Lake Hillsdale,* 473 So. 2d at 466. The mortgagee must have fairly attempted to collect its debt out of the mortgaged property, which requires more than just a price bid at foreclosure that does not "shock the conscience." *Wansley*, 566 So. 2d at 1224.

Thus a creditor is not free to use the foreclosure bid price as a sword, affirmatively to seek additional funds from the debtor with the bid price as the sole measure. However, a commercially reasonable sale, conducted within the guidelines already described, is a shield to the debtor's attempt to claim any part of the proceeds from a subsequent sale by the successful bidder. If the trustee conducted the sale reasonably, then the purchaser -- whoever it is -- can deal with the property free from claims of the former owner. As the court stated in *Wansley,* if the sale is commercially reasonable, then the amount bid is credited against the debt owed, even though the lender-bidder "had not realized so much as a penny." *Wansley,* 566 So. 2d at 1225. The chancellor never found, nor do we, that the amount bid failed to comply with the standards for a commercially reasonable foreclosure. Knowledge of a better price immediately waiting after foreclosure would seriously undermine the reasonableness of a sale. No such evidence exists here.

Nonetheless, what in essence the chancellor did is create a lien, held by the former owner, on any proceeds later earned that are greater than the debt owed. Such has never been the law in the state, or to our knowledge in any other state. The chancellor imposed this lien when the excess amount was 59,000/590,000 of the total debt, or 10 percent. A foreclosure is a forced sale. It often is also, as it was in this case, a forced buy. Magnolia did not in the normal sense want this house, and indeed tried to get Deposit Guaranty just to pay off Magnolia's note. An unwilling seller (the debtor through the trustee) and an unwilling buyer (the mortgagee) do not make for an arms length, fair market value sale. In one case, the supreme court said its conscience was not shocked when the property was purchased for in effect $47,000 (bid price plus amount of superior liens) and the "quick sale"

appraisal was $60,000. *Shutze*, 607 So. at 65. Thus historically a foreclosure has not realized an arms-length, willing buyer and seller price. To start requiring foreclosure purchasers to account for proceeds gained at subsequent arms length transactions would be a change in contract expectations that the legislature may wish to consider, but such a change is not for this court.

The $160,000 difference between the foreclosure bid price and a subsequent sales contract price just two days later created a suspicion. There is a concession now that despite appearances, no evidence of fraud or sharp dealing was found. As to the $160,000, that is an inflated figure that shows Magnolia bid less than it was owed. If others had been bidding, the price probably would have gone higher. Deposit Guaranty had a huge, soon to be unsecured loan. They were present for the foreclosure and bid no higher sum. This suggests a commercial reasonableness to Magnolia's actions.

Hufford would have us make a new rule for foreclosures, adopt it in a case in which the equity of doing so disappears as the facts reveal themselves, that creates a right that would significantly change the way deeds of trust traditionally have been interpreted. Hufford was entitled to attack the foreclosure itself, but not later events. Later events were driven by their own dynamics, unrelated to the foreclosure. Magnolia's selling an extremely expensive house without a loss and instead with a 10 percent profit, was certainly surprising. It does not qualify, however, as unconscionable.

This litigation is hardly the first time that a subsequent sale occurred at which a price higher than the foreclosure price was paid. This court must follow statute and precedent, which allows others who are not judges to have some chance of being able to plan their actions. That is the only way for citizens to have a sense of their rights, rights and responsibilities that are not totally subject to judicial whims. The supreme court has attempted to create some fairly large categories in the foreclosure challenge area, categories in which the vast majority of cases will fall and doubt would exist only at the margins. The first grouping is the "shock the conscience" inadequacy of price. The *least* inadequate price that has fit into that category has been 40% of market value; here the amount owed the creditor was 80-100% of the market value, depending on one's view of the facts. If the price is shockingly low, the remedy is to cancel the foreclosure, to allow the debtor to receive the benefit of the excess funds, or perhaps to apply other equitable remedies. The other category is for sales in which the bid price fell sufficiently below the value of the property as to invoke principles of equity. The remedy for cases of that class is to refuse to allow the foreclosure sales price to be the measure for a deficiency judgment. This case did not involve a bid price that was unconscionably low, nor is the creditor seeking a deficiency judgment. Thus neither line of cases applies.

As a result of our ruling on direct appeal, the cross-appeal is moot.

**THE JUDGMENT OF THE ADAMS COUNTY CHANCERY COURT IS REVERSED ON DIRECT APPEAL, AFFIRMED ON CROSS-APPEAL, AND JUDGMENT ENTERED HERE FOR APPELLANTS. ALL COSTS OF THIS APPEAL ARE TAXED TO THE APPELLEES.**


**BRIDGES, C.J., McMILLIN AND THOMAS, P.JJ., COLEMAN, HINKEBEIN, AND JJ., CONCUR.**


**KING, J., CONCURS IN RESULT ONLY.**

**PAYNE, J., DISSENTING WITH SEPARATE OPINION JOINED BY DIAZ, J.**

**HERRING, J., NOT PARTICIPATING.**

PAYNE, J., DISSENTING:

The majority would reverse the chancellor who required the mortgagee to return its windfall acquired two days after a foreclosure sale, therefore allowing this fortuitous circumstance for the lender and depriving the debtor of the difference between his indebtedness and the market value of the property. I particularly take exception to the majority's statement: "There is no law, however, that has required the purchaser at a valid foreclosure later to account to the original debtor." (Majority p. 7)

I believe *Central Financial Services, Inc. v. Spears,* 425 So. 2d 403 (Miss. 1983), does require just that. Although the figures in *Spears* are much lower, the principle remains the same. In *Spears* the original indebtedness was $1,250 plus interest, insurance, and fees making the total amount of the note $1,797.30, which was secured by a deed of trust on debtor's land. By the time of the foreclosure, the lender bid $1,458.86 which equaled the remaining balance on the debt plus costs of foreclosure. *Id.*

Less than two weeks later, the lender sold the property for $4,000 realizing a profit of $2,481.14 after paying off a $30 judgment. Almost four months later that purchaser sold the property for $6,500. The borrower sued to have the foreclosure set aside. The chancellor granted the lender's demurrer. In an unpublished opinion the supreme court reversed the chancellor and remanded for trial on the merits. *Id.* at 403-04.

At that trial, the chancellor found that the fair market value of the land was $6,000. The chancellor then required the lender to pay as damages to the borrower the difference between its cost and $6,000. The supreme court reversed to the degree that the amount the lender repaid was just its profit -- not the profit made by the later sale. However, in making its ruling affirming the lower court's holding in principle, the supreme court said:

We hold that a sale of mortgaged property within twelve days of the foreclosure sale at a price two and one-half times the bid of the mortgage is so inadequate, it would be "impossible to state it to a man of common sense without producing an exclamation at the inequality of it." The chancellor did not set the sale aside instead, he fashioned a remedy with which we agree in principle.

CFS [lender] was in compliance with the statutory law pertaining to the advertisement and sale of real property under deeds of trust. However, the sale of the property by CFS twelve days later resulted in a windfall to it of approximately $2,500. *We deem this windfall to be unjust.* If CFS had bid $4,000 at the foreclosure sale it would have been entitled to recover the amount of its indebtedness plus the expense of the sale, with the surplus being payable to Spears [debtor]. Certainly a sale *twelve days*

*later* for $4,000 enabled CFS to recover $2500 more that it risked in the transaction it made when it advanced $1250 to Spears.

. . . .

We are of the opinion, and hold, that the difference between the amount bid and the $4,000 received by CFS at the private sale twelve days later should be used in computing the amount due Spears.

*Id.* at 405 (emphasis added).

In the present case, I deem the windfall of $99,000, being purchase price of $650,000 minus indebtedness of $551,000, to be unjust. However, the chancellor found that actual expenses (including "a rather large attorney's fee") plus the debt equaled $590,831.02, leaving a "gain on the sale" of only $59,168.98. I would hold that gain to be unjust as well. The court in the *Spears* case did not find malice nor fraud, but did award the excess to the debtor/landowner.[1] I would do the same in this case by affirming the lower court's ruling.

**DIAZ, J., JOINS THIS SEPARATE WRITTEN OPINION.**

1. I agree with the majority that the surplus should first go to the junior lienor, according to *Builder's Supply Co. v. Pine Belt Sav. and Loan Assoc.*, 369 So. 2d 743, 745 (Miss. 1979), but that is of no benefit to the appellant here.